**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Apr 03 2013, 8:25 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**RUTH JOHNSON**
Marion County Public Defender
Indianapolis, Indiana

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF
CHILD SERVICES:

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of E.B., minor child, and T.S., biological father, | ) ) ) ) | |
| T.S., | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 49A05-1208-JT-414 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn Moores, Judge
The Honorable Larry Bradley, Magistrate
Cause No. 49D09-1204-JT-14752

**April 3, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

T.S. ("Father")[1] appeals the involuntary termination of his parental rights to his child, E.B.  In so doing, Father challenges the sufficiency of the evidence supporting the trial court's judgment.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The facts supporting the termination of Father's parental rights to his child, E.B., who was born on May 27, 2010, reveal that on March 29, 2011, Father was found in possession of a crack pipe and an open bottle of liquor while caring for E.B., who at the time was less than one year old.  Father also fought with law enforcement officers who arrived at the scene prior to Father's arrest and incarceration.  At that time, the Marion County Department of Child Services ("MCDCS") received a report that Father had been drinking that day and had gotten into a fight with a female.  When Father went out to obtain more alcohol and crack cocaine, he walked through a parking lot in the middle of the night with E.B., who was not dressed appropriately for the cold weather conditions. Father had in his possession a crack pipe and an open bottle of liquor.  Following Father's fight with law enforcement officers, he was detained, searched, and arrested for possession of paraphernalia and resisting law enforcement.  Father had a history of public intoxication and other criminal behavior.

L.B. ("Mother"), E.B.'s mother, was incarcerated at the time and was living in a boarding home, a place not approved for placement of E.B.  MCDCS filed a Petition

[1] Through the initial portion of the proceedings, Father was referred to as the alleged father of E.B.  The January 3, 2012 dispositional order is the first order in which Father is listed as E.B.'s father. Father's paternity was established in the juvenile court. *Tr.* at 46.

Alleging Child in Need of Services ("CHINS Petition") alleging that E.B. was a child in need of services ("CHINS"). The juvenile court held an initial/detention hearing at which Father failed to appear due to his incarceration. The juvenile court continued placement of E.B. in foster care and authorized Father to have supervised parenting time upon his release from incarceration.

On April 12, 2011, the juvenile court held a continued initial hearing, which was further continued due to Father's incarceration at Corrections Corporation of America. On April 26, 2011, the juvenile court held another continued initial hearing, where MCDCS presented Father's signed summons and rights. The juvenile court appointed a public defender to represent Father and entered a denial to the CHINS Petition on his behalf. On May 24, 2011, Father appeared at a pretrial hearing where the juvenile court issued an order that Father have supervised parenting time pending any criminal "no contact" orders with E.B. On June 21, 2011, Father failed to appear at a pretrial hearing, but was represented by counsel. At that time the juvenile court established a date for the fact-finding hearing.

On August 16, 2011, the juvenile court held a fact-finding hearing during which, Father, by counsel, admitted that E.B. was a CHINS. Mother also admitted that E.B. was a CHINS. At that time, a criminal no contact order was in place between Father and E.B. The juvenile court formally removed E.B. from Father's care and held a dispositional hearing on September 20, 2011. The juvenile court issued a Parental Participation Order in which Father was required to do the following: 1) contact the caseworker every week; 2) notify the family case manager of any arrest or criminal charges within five days; 3)

3

secure and maintain a legal and stable source of income; 4) obtain and maintain suitable housing; 5) establish paternity of E.B.; 6) participate in and successfully complete a home-based counseling program and successfully complete any recommendation of the counselor; 7) complete a substance abuse assessment and successfully complete all recommendations; 8) participate in random drug screens; 9) follow all terms of probation; and 10) participate in a domestic violence assessment and successfully complete all recommendations. Father, who had been released from jail after the incident precipitating the filing of the CHINS Petition, but was incarcerated again for trespassing, did not appear at this hearing due to his most recent incarceration.

Prior to the CHINS adjudication, home-based case management provider Susan Kessler ("Kessler") exchanged telephone numbers with Father when they met at a CHINS mediation in the summer of 2011. Kessler closed the referral, however, after approximately fifteen days because Father did not contact her. Kessler had called Father three times and gave him ten days in which to respond to her calls.

MCDCS family case manager Darlene White ("FCM White") began working with Father in May 2011. Father contacted FCM White in October 2011, but did not contact her again until January 2012 to report his entrance into a Technical Rules Violator program ("TRV program"), at the suggestion of his adult probation officer. Father was required to reside at the Duval Residential Center from January 2012 through March 2012. While at the Duval Residential Center, Father participated in a job readiness program called PACE, and a six-week class on cognitive thinking processes, called Thinking for a Change. Father completed the two-day PACE program, but attended only

4

two of the Thinking for a Change classes. When Father failed to return to the Duval Residential Center one day, a warrant was issued for his arrest. Father was found to be in violation of the conditions of his probation and was ordered to serve the remainder of his sentence. Father was released from incarceration shortly before the termination hearing. Father had contacted FCM White and had informed her that he had been released from the TRV program and had completed his probation. FCM White discovered that Father had instead violated his probation. Father provided FCM White with new telephone numbers, but she was never able to reach Father at the telephone numbers provided.

On April 12, 2012, MCDCS filed a petition for the involuntary termination of Father's rights to E.B. A periodic review hearing was held on July 17, 2012, at which Father failed to appear, but was represented by counsel. The juvenile court noted in its order after that hearing that Father had not complied with the case plan and E.B.'s permanency plan was adoption. The initial hearing on the termination petition was continued, and on May 18, 2012, the juvenile court held a continued initial hearing on the petition. MCDCS reported that Father was incarcerated at the Plainfield Correctional Facility and had signed a certified mail green card. MCDCS reported that it had not received signed copies of the summons and rights forms from Father.

Father wrote to the juvenile court on May 21, 2012, advising that he was incarcerated and stating his projected release date. The next day, MCDCS filed a notice of submission of summons and rights for Father and a request for a public defender. The juvenile court noted Father's incarceration, appointed a public defender to represent him, and set the matter for a pre-trial hearing. At the June 1, 2012 pre-trial hearing, the

juvenile court noted Father was still incarcerated with a release date of July 12, 2012. The court set the matter for mediation as to Mother only and set the matter for trial.

On July 30, 2012, the juvenile court held an evidentiary hearing and took the matter under advisement. Father failed to appear at that hearing. On August 1, 2012, the juvenile court issued its order terminating Father's parental rights as to E.B. Father now appeals.

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Father's parental rights, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the

6

findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B)   that one (1) of the following is true:
>   (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>   (ii)   There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>   (iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services; [and]
>
> (C)   that termination is in the best interests of the child and;
> (D)   that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these

7

allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). Father challenges the sufficiency of the evidence supporting the trial court's findings as to subsection (b)(2)(B) of the termination statute cited above.

In order to properly effectuate the termination of parental rights under Indiana Code section 31-35-2-4(b)(2)(B), the trial court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *See e.g. L.S.*, 717 N.E.2d at 209. Although we need only address one of the three requirements, we will address both that are challenged by Father.

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider any services offered to the parent by the county department of child services (here, MCDCS) and the parent's response to those services, as evidence of whether

conditions will be remedied. *Id.* Moreover, the MCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *See In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Here, the trial court's order contains numerous findings that indicate Father's unwillingness to change his behavior in order to be reunified with E.B. More specifically, Father failed to: 1) participate in home-based services; 2) take random urine screens; 3) adequately address concerns of alcohol and drug abuse; 4) adequately address anger management concerns; and 5) exercise visitation with E.B., not having seen her since September 2011. Father had been in and out of jail during the CHINS proceedings with periods of incarceration due to a probation violation, and convictions of battery, operating a vehicle while intoxicated, and criminal trespass. During Father's adult life, he has accumulated nineteen felony or misdemeanor convictions. On June 12, 2012, the last occasion that FCM White spoke with Father, he had not achieved financial stability and had not secured stable housing.

Father challenges the sufficiency of the evidence supporting the juvenile court's conclusions that there is a reasonable probability that the conditions resulting in E.B.'s removal from Father's care will not be remedied and that continuation of the parent-child relationship poses a threat to E.B.'s well-being. In short, it appears that Father does not challenge the findings, but rather, the conclusions drawn from those findings. We say this, because Father's argument consists primarily of commentary about the alleged absence of evidence. Based on the foregoing, we find Father's assertions on appeal

amount to an impermissible invitation to reweigh the evidence. *D.D.*, 804 N.E.2d at 265.

Nonetheless, we find that the evidence supports the juvenile court's findings, and those findings, in turn support the juvenile court's conclusions. The record reveals that the conditions leading to E.B.'s removal from Father remained unchanged, and we have set forth the supporting evidence above. Father's inability and/or unwillingness to provide stable housing, address anger management concerns, or address concerns of alcohol and drug abuse, are supported by the record and support the juvenile court's conclusions. Those conclusions support the juvenile court's decision to terminate Father's rights.

A juvenile court must subordinate a parent's interests to those of the child. *In re J.S.*, 906 N.E.2d 226 (Ind. Ct. App. 2009). E.B. has been in foster care since her removal from Father's care and has thrived in that environment. The guardian ad litem recommended the termination of Father's parental rights and that adoption was the permanency plan that was in E.B.'s best interests.

We will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to E.B. was clearly erroneous. We therefore affirm the juvenile court's judgment.

Affirmed.

VAIDIK, J., and PYLE, J., concur.